# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 12-CV-02834-WYD-MJW

NATIONAL JEWISH HEALTH, a Colorado non-profit corporation

       Plaintiff,

v.

WEBMD HEALTH SERVICES GROUP, INC. and
WEBMD HEALTH CORP.

       Defendants.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ("REPORT")
ON PLAINTIFF'S MOTION FOR SANCTIONS
AND
RECOMMENDATION**

---

## INTRODUCTION

I was appointed pursuant to the "Order Appointing as a Special Master the Honorable Ronald J. Hedges (Ret) United States Magistrate Judge from the District of New Jersey" [Doc. 102]. I conducted an evidentiary hearing on February 3 and 4, 2014 (the "Hearing") on Plaintiff National Jewish Health's ("NJH") Motion for Rule 37 Sanctions [Doc. 72] ("Motion").

Gary R. Maze, Esq. and James L. Wooll, Esq. of Berenbaum Weinshienk, P.C., appeared on behalf of NJH. K.C. Groves, Esq., Mark E. Lacis, Esq., and Benjamin J. Larson, Esq., of Ireland Stapleton Pryor & Pascoe, P.C., appeared on behalf of Defendants WebMD Health Services Group, Inc. ("WHSG") and WebMD Health Corp. ("WHC") (collectively, "WebMD").

I have considered the papers submitted in support of and in opposition to the motion. I

1

have also considered the testimony of the witnesses and the exhibits admitted at the hearing, as well as argument of counsel. The following constitute my Findings of Fact and Conclusions of Law (otherwise known as "the Report") and Recommendation.

## FINDINGS OF FACT

**WebMD Uses Enterprise Vault To Maintain Its Email In The Usual Course Of Its Business**

1. WebMD maintains its email in the usual course of its business in a shared email system used by WHC and its subsidiaries, including WHSG. The system is comprised of Microsoft Exchange 2010 and Symantec Enterprise Vault. (Tr. 91:15 92:4). Enterprise Vault interfaces with Microsoft Exchange and automatically archives all email messages of WebMD's employees after 90 days. (Tr. 92:20 93:12). Enterprise Vault also provides "journaling" and e-discovery capabilities not available in Microsoft Exchange. (Tr. 92:5 15).

2. Enterprise Vault's journaling feature immediately captures and stores a copy of every email sent or received by any employee of WebMD or its subsidiaries, with all attachments, in a single inbox called the "Journal Vault." (Tr. 93:14 21; 95:6 16; 95:21 96:1). This journaling feature automatically de-duplicates emails when adding a copy of an email to the Journal Vault. (Tr. 96:2 17).

3. Enterprise Vault's e-discovery tool gives WebMD's authorized information technology ("IT") personnel the ability to search for responsive emails in the Journal Vault. (Tr. 96:20 23). When used to respond to litigation discovery requests, the e-discovery tool de-duplicates responsive emails and exports those emails into PST files. (Tr. 97:19 98:5).

4. Enterprise Vault was installed at WebMD in July 2009. (Tr. 92:16 19). The

journaling and e-discovery components of Enterprise Vault became active in April 2010. (Tr. 98:20  23).  Email messages that existed prior to the implementation of Enterprise Vault were "ingested" into the Journal Vault within Enterprise Vault from user mailboxes in Microsoft Exchange and from tape backups. (Tr. 99:2  23).

5. One of the purposes of the Journal Vault is to prevent employees from deleting emails that may be relevant in legal proceedings. (Tr. 101:13  17). WebMD selected three authorized IT employees—Paul Mort, Mike Stawchansky, and Chad Holmes—to have "read-only access" to the Journal Vault. (Tr. 101:18  102:10). "Read-only access" means these three employees can read, but cannot modify or delete, data stored in the Journal Vault. (Tr. 102:10  14).  No other WebMD employees have access to the Journal Vault. (Tr. 101:24  102:7). No WebMD employee has the ability to delete emails in the Journal Vault. (Tr. 100:3  11).

**The Enterprise Vault Production**

6. Paul Mort ("Mort") is WebMD's Director of Corporate Technology. (Tr. 90:9  10). He personally gathered and produced emails from WebMD's Journal Vault to respond to NJH's discovery requests. (Tr. 106:1  23). In doing so, he followed WebMD's standard procedures and protocols. (Tr. 106:24  107:3).

7. Using the e-discovery tool in Enterprise Vault and search criteria provided by

WebMD's internal legal team, Mort searched the Journal Vault for responsive emails.[1] (Tr. 107:4 18). The responsive emails were then exported into 125 PST files, each containing 1.2 gigabytes of data (the default size for individual PST files exported from Enterprise Vault). (Tr. 107:5 108:13). The emails within each PST file were organized chronologically with all attachments. (Tr. 108:20 109:1).

8.  Mort then gave WebMD's internal legal team secure access to the 125 PST files by transferring the files to WebMD's file transfer protocol ("FTP") server. (Tr. 107:4 18). In turn, secure access to the FTP server was given to Orange Legal Technologies ("OLT"), the third-party vendor hired by WebMD to manage its production of electronically stored information ("ESI"). (Tr. 16:11 25; 47:24 48:4; 97:2 18). OLT de-duplicated the 125 PST files and processed them for production. (Tr. 36:1 3; 45:5 16).

**The OLT Discovery Bot Collection**

9.  In addition to the Enterprise Vault Production, OLT collected ESI directly from WebMD through the use of a remote collection discovery "bot" application (the "Discovery Bot"). (Tr. 27:10 29:6).

10. The Discovery Bot captures and preserves the metadata of the ESI it collects. (Tr. 29:22 31:6). The ESI collected through the use of the Discovery Bot was collected in a forensically sound manner. (Tr. 27:10 19; 32:1 6).

---

[1] Paragraphs 26 and 31 of Exhibit D-1 contain a list of current and former WebMD employees whose email accounts were searched and a list of search terms used to perform the search of WebMD's ESI. (Tr. 15:23 16:25).

**The WebMD ESI Production**

11. WebMD's counsel conferred "on multiple occasions" with NJH's counsel and indicated that WebMD was prepared to produced its ESI in the following format:

- Individual native files with attachments extracted;
- .DAT file using standard concordance delimiters and containing metadata (standard fields) for the above mentioned native files; and
- Text files/OCR for each native file provided as individual text files with a text path provided in the .DAT file.

(April 24, 2013 Letter from M. Lacis to G. Maze at p. 2, **Plaintiff's Ex. A-3** [Doc. 72-4]). NJH did not object to the form of the proposed production, and with respect to the load files associated with the production, indicated its preference for the formatting of the load files, noting that "Concordance will be fine." *Id.* at p. 3.

12. After collecting, receiving, and processing WebMD's ESI, OLT removed approximately 100,000 duplicate documents. (Tr. 36:1 3). OLT then produced approximately 279,000 WebMD ESI documents directly to NJH in a manner consistent with the parties' conferral (the "WebMD ESI Production"). (Tr. 34:9 25; 36:4 21; 63:8 17).

13. All the emails and email attachments produced to NJH from WebMD's Enterprise Vault (the "Enterprise Vault Production") came from a single source, *i.e.*, the Journal Vault within Enterprise Vault (Tr. 111:9 24). These are fully text searchable, sortable, and paired with all metadata (Tr. 109:2 110:9; 111:25 112:12), constitute authentic business records of WebMD (Tr. 110:19 25), and were produced as kept in the usual course of WebMD's business (Tr. 112:13 15). WebMD – rather than any individual or individuals -- is the proper records custodian for the Enterprise Vault Production. (Tr. 103:6 16; 110:10 13; 24:9 25:10).

14. "Native" format means the format in which the file originally resided on the

5

custodian's computer or server. (Tr. 63:21  64:5). "Near native" format means a converted format similar to the "native" format, such as an MSG or HTM file for email. (Tr. 64:6  10). NJH requested the production of email in MSG format, a "near native" format, and WebMD, through OLT, complied with that request by producing emails to NJH in MSG format. (Tr. 66:9  25). WebMD produced all email attachments and standalone non-email documents in native format. (Tr. 68:17  22; 109:24  110:9).

15. As NJH requested, OLT also generated Concordance load files associated with the WebMD ESI Production. (Tr. 33:17  34:8; 37:4  10). At the Hearing, John Munro of OLT ("Munro") used those same load files when he demonstrated a live, running instance of the WebMD ESI Production using Concordance. (Tr. 17:1  26:20; 186:14  187:13).

16. I was able to search the running instance of the WebMD ESI Production, using search terms taken from Exhibit D-1, as well as searches conceived by me. (Tr. 17:1  26:20). I was also able to search the WebMD ESI Production by individual names to identify all email correspondence between a given sender and recipient (Tr. 73:17  75:8; Ex. D-8), search specific witness emails, specifically those disclosed in Exhibit D-1 (Tr. 17:4  20:19) and, perform keyword "searches-within-searches" of existing search results (Tr. 22:15  24:5; Exs. D-4 and D-5). The WebMD ESI Production is fully searchable. (Tr. 26:18  20; 37:17  38:21).

17. The WebMD ESI Production reveals all persons copied on emails. (Tr. 18:13  15). Attachments to emails within the WebMD ESI Production can be retrieved, as demonstrated during the Hearing. (Tr. 18:16  20:19; Ex. D-2).

18. The WebMD ESI Production can be sorted by metadata fields, *e.g.*, by date. (Tr. 37:17  38:21). Additionally, the Enterprise Vault Production and the ESI collected through the

Discovery Bot are capable of being sorted using custodian information, as well as source and folder location. (Tr. 46:25 48:9). The WebMD ESI Production is fully sortable. (Tr. 21:19 22:14; Ex. D-3; Tr. 37:17 38:21).

**NJH's Failure of Proof In Support Of Its Motion**

19. NJH did not offer a live, running instance of the WebMD ESI Production as NJH received it from OLT. (Tr. 151:14 24). Instead, NJH offered the testimony of a single witness, Erin Perczak. (Tr. 146:10 12).

20. Mr. Perczak did not review or perform searches of any of the 279,246 documents contained in the WebMD ESI Production. (Tr. 166:2 9; 177:25 178:22). Rather, he confined his review to the 34 Concordance load files produced by WebMD through OLT and performed a "very small" analysis of those load files. (Tr. 156:5 21). Mr. Perczak spent "a couple of hours, probably three hours" in total, loading and reviewing the Concordance load files produced in connection with the WebMD ESI Production. (Tr. 174:17 175:4).

21. Although he was unable to answer a number of questions posed by NJH's counsel on direct examination (Tr. 163:16 165:25), Mr. Perczak testified that he "felt that in the population, there were 107,227 records which had more than one entry for any [MD5] hash field that were identical" and, based on that "analysis," he concluded that there were roughly 107,000 duplicates in the WebMD ESI Production. (Tr. 164:12 165:3; Ex. P-1). However, Mr. Perczak's testimony about the possible existence of 107,227 duplicate documents "did not put in context the fact that they could be attachments." (Tr. 189:7 190:6). Mr. Perczak merely subtracted the number of unique MD5 hash values from the entire 279,246 ESI documents

contained in the WebMD ESI Production to estimate that there were 107,227 potential duplicates. (Tr. 189:7 190:13).

22. However, if a unique file is attached to multiple different emails, that same file would appear in multiple locations in the WebMD ESI Production because all emails and their attachments are considered as one communication for de-duplication purposes. (Tr. 87:5 14). The unrebutted testimony of Munro was that there are 56 true duplicates in the WebMD ESI Production. (Tr. 190:14 191:4; 196:8 14).

23. While OLT produced Concordance load files as NJH requested (Tr. 36:25 37:10), NJH did not present any evidence that it loaded the WebMD ESI Production into Concordance or another document review platform. (Tr. 237:9 22). In fact, NJH did not present any evidence that it performed any searches of the WebMD ESI Production using any document review platform. *Id*.

24. WebMD incurred over $237,000 in costs associated with producing ESI in this case. (Resp. in Opp. to Mot., Ex. B, Decl. of Roger Bradley ¶ 12 [Doc. 82-8]).

**CONCLUSIONS OF LAW**

**The WebMD ESI Production Complies With Rule 34(b)(2)(E)(ii)**

1. Rule 34(b)(2)(E) provides that unless otherwise stipulated or ordered by the court, the following procedures apply to producing documents or ESI:

   (i) A party must produce <u>documents</u> as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request;

   (ii) If a request does not specify a form for producing <u>electronically stored information</u>, a party must produce it in a form

> or forms in which it is <u>ordinarily maintained</u> or in a <u>reasonably usable form or forms</u>; and
>
> (iii) A party need not produce the same electronically stored information in more than one form.

*Fed. R. Civ. P.* 34(b)(2)(E) (emphasis added).

 2. The Advisory Committee Note to the 2006 amendment to Rule 34(b) clarifies the rule:

> <u>The rule does not require a party to produce electronically stored information in the form it [*sic*] which it is ordinarily maintained, as long as it is produced in a reasonably usable form</u>. But the option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation. <u>If the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature</u>.

*Advisory Committee Note to 2006 amendment to Fed. R. Civ. P.* 34(b) (emphasis added). Thus, when ESI is kept in an electronically-searchable form, it "should not be produced in a form that removes or significantly degrades this feature." *Aguilar v. Immigration & Customs Enforcement Div.*, 255 F.R.D. 350, 355 (S.D.N.Y. 2008) (*citing Advisory Committee Note to 2006 amendment to Fed. R. Civ. P.* 34(b)).

 3. Under Rule 34, a distinction between documents and ESI is made in terms of form of production. *United States v. O'Keefe*, 537 F. Supp. 2d 14, 23 (D.D.C. 2008). A party is obligated to produce <u>documents</u> either as these are kept in the usual course of business or the party "must organize and label them to correspond to the categories in the request." *Id.* (*citing Fed. R. Civ. P.* 34(b)(2)(E)(i)). On the other hand, if the request does not specify a form of

9

production, the responding party must produce *ESI* in the form in which it is ordinarily maintained or in a reasonably usable form or forms. *Id.* (*citing Fed. R. Civ. P.* 34(b)(2)(E)(ii)). Additionally, a party "need not produce the same electronically stored information in more than one form." *Id.* (*citing Fed. R. Civ. P.* 34 (b)(2)(E)(iii)).

4. The distinction in Rule 34(b)(2)(E) between the production of documents versus the production of ESI has been explained as follows:

> The distinction between the procedures in subparagraph (E)(i) and (E)(ii) is made plain in the language of the two pertinent provisions. By its terms, subparagraph (E)(i) applies only to "documents," while subparagraph (E)(ii) applies to ESI. Though lawyers and judges have long interpreted "documents" to include ESI, Rule 34(a)(1)(A) and the accompanying Committee Note make clear that ESI is separate from and distinguishable from documents. The rule deliberately refers separately to "designated documents" and "electronically stored information" to highlight the differences between them (Rule 34(a)(1)(A)). Therefore, ESI is not a subset of documents; it is a new category in addition to documents. *See* Report of Advisory Committee on Civil Rules to Committee on Rules of Practice and Procedure, July 25, 2005, found in House Document 109-105, at 157 158 (2006) (The Committee decided to recommend making 'electronically stored information' separate from 'documents.') The distinction was drawn primarily to recognize the difficulty in fitting different forms of ESI, like dynamic databases that constantly change, within the traditional concept of document. *See* Committee Note to Rule 34(a) (2006).

J.K. Rabiej, 2008 Emerging Issues 2628, *Rabiej on Production of ESI*, July 29, 2008.[2]

5. Although several decisions have held that the production of ESI must comply with the traditional production requirements governing the production of paper documents in

---

[2] John K. Rabiej is the former Chief of the Rules Committee Support Office of the Administrative Office of the United States Courts and the former Executive Director and Director of Judicial Outreach for the Sedona Conference.

10

addition to complying with the specific ESI production requirements—*i.e.*, that ESI must be produced as kept in the usual course of business or must be organized and labeled to correspond to the categories in the production request—these decisions "impose an unwarranted burden not intended under the Rule 34(b)(2)(E)(ii) amendments, which expressly require that ESI be produced only in the form it is regularly maintained or in a reasonably usable form." 17-15 *Bender's Forms of Discovery Treatise* § 15.125.

6.      Here, in its Requests for Production, NJH requested that WebMD produce ESI in native format or, if such production was prohibited by law or required special software not freely available, in TIFF or PDF formats. (April 24, 2013 Letter from M. Lacis to G. Maze at p. 1, **Plaintiff's Ex. A-3**).

7.      Notwithstanding the general description contained in NJH's requests, NJH also specifically requested that WebMD produce emails in MSG format, which is a near-native format. (*See* Findings of Fact, *supra* ("FoF") ¶ 14). WebMD complied with that request and produced email in MSG format. (FoF ¶ 14). All email attachments were extracted and produced in native format, consistent with the parties' conferral. (FoF ¶¶ 11, 14). The standalone non-email documents were produced in native format. (FoF ¶ 14).

8.      Even if NJH had not requested the production of emails in MSG format, WebMD's production of emails in MSG format would be proper. Rule 34(b)(2)(E)(ii) trumps specific instructions in discovery requests such that "even if native files are requested, it is sufficient to produce memoranda, emails, and electronic records in PDF or TIFF format accompanied by a load file containing searchable text and selected metadata . . . because the production is in usable form, e.g., electronically searchable and paired with essential metadata."

*Aguilar*, 255 F.R.D. at 356 57 (*citing Sedona Principles*). "Email is not typically produced in native file format because the extraction of individual emails from a large database containing other emails requires conversion of the file format into a near-native format."  1-37A *Moore's Federal Practice - Civil* § 37A.43.

9. WebMD maintains its ESI in an electronically searchable form.  (FoF ¶¶ 1, 3, 7). WebMD responded to NJH's Requests for Production by producing its ESI in an electronically searchable form.  (FoF ¶ 13).  All of the WebMD ESI Production is searchable, sortable, paired with relevant metadata, and includes Concordance load files, as requested by NJH.  (FoF ¶¶ 11, 13, 15, 18).  Therefore, WebMD produced its ESI as NJH requested it and in the form in which it is ordinarily maintained. (FoF ¶¶ 1, 7).

10. The WebMD ESI Production also was produced in a reasonably usable form. WebMD did nothing to compromise or "significantly degrade" the ability of NJH to fully search or sort the WebMD ESI Production.  (FoF ¶¶ 13, 16, 18).

11. NJH offered no evidence of an inability to search or sort the WebMD ESI Production and, in fact, offered no evidence that NJH ever attempted to search or sort the WebMD ESI Production.

12. Accordingly, WebMD produced its ESI in compliance with Rule 34(b)(2)(E)(ii).

**WebMD's ESI Production Complies With Rule 34(b)(2)(E)(i)**

13. Even though Rule 34(b)(2)(E)(i) does not apply to ESI, the WebMD ESI Production nevertheless complied with this rule.

14. Rule 34(b) permits a producing party to choose whether to produce documents as they are kept in the usual course of business or to organize and label the documents to

correspond to categories in the request. Rule 34(B)(2)(E)(i). If the producing party produces documents as they are kept in the usual course of business, "the Rule imposes no duty to organize and label the documents, provide an index of the documents produced, or correlate the documents to the particular request to which they are responsive." *MGP Ingredients, Inc. v. Mars, Inc.*, No. 06-2318-JWL-DJW, 2007 U.S. Dist. LEXIS 76853, at *10 (D. Kan. Oct. 15, 2007)); *Valeo Elec. Sys. v. Cleveland Die & Mfg. Co.*, No. 08-cv-12486, 2009 U.S. Dist. LEXIS 51421, at *8 (E.D. Mich. June 17, 2009) ("[O]nce a party demonstrates that it has produced documents as they are kept in the usual course of business, it has no further duty under Rule 34 <u>or otherwise</u> . . . to organize and label the documents.") (emphasis added).

15.   Rule 34(B)(2)(E)(i) is satisfied where "the production allows the requesting party to reasonably determine what documents are responsive to its requests." *Armor Screen Corp. v. Storm Catcher, Inc.*, No. 07-81091-Civ-Ryskamp/Vitunac, 2009 U.S. Dist. LEXIS 63538, at *9 (S.D. Fla. Feb. 5, 2009).

16.   WebMD maintains its documents in an electronically searchable form, (FoF ¶¶ 1, 3, 7); WebMD responded to NJH's Requests for Production by producing documents in an electronically searchable form, (FoF ¶ 13); and all the documents contained within the WebMD ESI Production are searchable, sortable, paired with relevant metadata, and included Concordance load files, as requested by NJH. (FoF ¶¶ 11, 13, 15, 18). Therefore, WebMD produced its ESI in the manner in which it is kept in the usual course of WebMD's business. (FoF ¶¶ 1, 7).

17.   NJH contends WebMD did not produce emails as kept in the usual course because an individual must serve as the custodian of emails. However, testimony was undisputed that

WebMD, as an organization, is the custodian of the emails stored in the Journal Vault within Enterprise Vault.  (FoF ¶ 13).

18. A company, through an IT department, can serve as the custodian of electronic files kept on company servers.  *See Healix Infusion Therapy, Inc. v. HHI Infusion Servs.*, No. 10 C 3772, 2011 U.S. Dist. LEXIS 7856, at *3  5 (N.D. Ill. Jan. 27, 2011) (permitting IT department records custodian to authenticate emails kept on company's server as business records); The Sedona Conference, *Glossary, E-Discovery & Digital Information Management* 43 (2d ed. Dec. 2007) (defining "Record Custodian" and explaining that "some organizations may place this responsibility within their Information Technology Department, or they may assign responsibility for retaining and preserving records with individual employees").

19. The purpose of a records custodian is to ensure the records' "credibility, reliability, accessibility and ultimate disposition or destruction." *See* The Sedona Conference, *Best Practices Guidelines & Commentary for Managing Information & Records in the Electronic Age*, cmt. 4.e, p. 34 (2d ed. Nov. 2007).

20. While NJH's arguments as to "custodianship" may be applicable with respect to Microsoft Outlook and Exchange environments, WebMD maintains its email ESI in Enterprise Vault.  (FoF ¶¶ 1, 13).  In the usual course of its business, WebMD—through its IT department—is the proper records custodian of such ESI.  (FoF ¶¶ 5, 13).  I am satisfied that the collection and production of WebMD's ESI was sufficient to preserve the ability to search and sort the WebMD ESI Production.  (FoF ¶¶ 11, 13, 16, 18).  Moreover, all appropriate metadata was produced with the WebMD ESI Production.  (FoF ¶¶ 10, 13, 18).

21. Accordingly, WebMD produced its ESI "documents" as these are kept in the

usual course of WebMD's business and in compliance with Rule 34(b)(2)(E)(i).

**WebMD Properly Objected To NJH's Overly Broad And Unduly Burdensome Interrogatories**

22.     Rule 33(d) provides the option of producing business records in lieu of answering an interrogatory if the burden of deriving or ascertaining the answer will be substantially the same for either party.

23.     The purpose of this option to produce documents in the usual course of business is to place the burden of research on the party seeking the information, instead of requiring the responding party to conduct a burdensome or expensive search of its own records. *Daiflon, Inc. v. Allied Chem. Corp.*, 534 F.2d 221, 225  26 (10th Cir. 1976) (*citing Advisory Committee Note to 1970 amendment to Fed. R. Civ. P. 33(c)*); *see SEC v. Elfindepan, S.A.*, 206 F.R.D. 574, 577 (M.D.N.C. 2002) (Rule 33(d) was intended to be used when interrogatories make broad inquiries and numerous documents must be consulted to ascertain facts)).

24.     Only in "exceptional circumstances" have courts compelled a producing party to further organize its documents. *See 3M Co. v. Kanbar, MK*, No. C06-01225 JW, 2007 U.S. Dist. LEXIS 45232, at *7  10 (N.D. Cal. 2007) (refusing to find exceptional circumstances where moving party complained about sorting through "a mass of documents" because outcome was a "predicament of [moving party's] own making" as a result of the "broad document requests").

25.     "[O]nce a party demonstrates that it has produced documents as they are kept in the usual course of business, it has no further duty under Rule 34 <u>or otherwise</u> . . . to organize and label the documents." *Valeo*, 2009 U.S. Dist. LEXIS 51421, at *8 (emphasis added).

26.     A party may properly object to overly broad or unduly burdensome discovery requests that seek to impose the duty of organizing documents according to another party's document requests. *MGP Ingredients, Inc.*, 2007 U.S. Dist. LEXIS 76853 at *10   15.

> Requiring further that these requested documents be segregated according to the requests would impose a difficult and usually unnecessary additional burden on the producing party. The categories are devised by the propounding party and often overlap or are elastic, so that the producing party might be compelled to decide which best suits each item in order to consign it to the proper batch. Such an undertaking would usually not serve any substantial purpose, and it could become quite burdensome if considerable numbers of documents were involved.

*Id.* at * 12 (*citing* 8A Wright & Miller, *Fed. Prac. and Proc.* § 2213 at p. 431 (2d ed. 1994)).

27.     Here, NJH served overly broad requests for production followed by interrogatories mirroring those requests, thereby demanding that WebMD organize and categorize its production.  For example, Interrogatory No. 18 seeks identification of "all documents sufficient to evidence the development of the WebMD fitness program," as requested in Request for Production No. 1. **Defendants' Ex. A**, Lacis Decl. [Doc. 82-1] ¶¶ 14, 15, Exs. 3 [Doc. 82-4], 5 [Doc. 82-6].  This type of interrogatory that seeks a general category or group of documents concerning a broad range of items is overly broad on its face. *Sonnino v. Univ. of Kan. Hosp. Auth.*, 221 F.R.D. 661, 667, 671 n.36 (D. Kan. 2004).

28.     As a result of the overly broad requests for production and corresponding interrogatories, WebMD spent a significant amount of time and money collecting and producing its ESI.  (FoF ¶ 24).  Because NJH has the ability to fully search and sort the WebMD ESI Production, the burden of categorizing that ESI pursuant to each Request for Production is substantially the same for NJH as it is for WebMD. *See Little Hocking Water Ass'n v. E.I. du*

*Pont de Nemours & Co.*, No. 2:09-cv-108, 2013 U.S. Dist. LEXIS 22374, at *120 n.23 (S.D. Ohio February 19, 2013); *see Berster Techs., LLC v. Christmas*, 2:11-cv-1541-KJM-JFM, 2011 U.S. Dist. LEXIS 114499, at *8 (E.D. Cal. Oct. 3, 2011) (concluding that burden to sort was substantially same and denying motion to compel because documents were produced in electronic, searchable format). Consequently, WebMD's objections to NJH's interrogatories were properly lodged, and NJH's request for an index of WebMD's ESI Production is not warranted under the circumstances.

**Rule 37(a)(5)(B) Sanctions Are Not Warranted Against NJH And Its Counsel**

29. WebMD made an informal request for the imposition of sanctions in its opposition papers. Rule 37(a)(5)(B) provides, in pertinent part, as follows:

> If the motion is denied, the court . . . must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

30. To avoid a mandatory award of expenses, including attorney's fees, under Rule 37(a)(5)(B), the moving part must show that its motion had a "reasonable basis both in law and fact." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988); *Kirzhner v. Silverstein*, No. 09-cv-02858-RBJ-BNB, 2012 U.S. Dist. LEXIS 5144, at *15 (D. Colo. Jan. 17, 2012).

31. The Motion had a reasonable basis in law and fact. Although the Motion was based on a technical analysis of the WebMD ESI Production, reasonable minds could – and often do – differ with regard to ESI, the various forms in which ESI exist in a given information system, and the application of case law to the facts *sub judice*.

**32.** I am satisfied that the Motion was substantially justified.

## RECOMMENDATION

For the reasons set forth in the Report above, I recommend that NJH's Motion for Rule 37 Sanctions and WebMD's informal request for sanctions both be DENIED.

**The parties may object to this Report & Recommendation within the same time limitations for objection to a magistrate judge's ruling under *Fed. R. Civ. P.* 72. The filing of a Bill of Costs shall await any ruling on this Report & Recommendation.**

/s/ Ronald J. Hedges, Special Master